UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Lakeside Terrace Homes Sales, Ltd., et al.,** | ) ) ) | **CASE NO. 1:15 CV 1794** |
| Plaintiffs, | ) ) | **JUDGE PATRICIA A. GAUGHAN** |
| Vs. | ) ) | |
| **Arrowood Indemnity Co.,** | ) ) | **Memorandum of Opinion and Order** |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon Arrowood Indemnity Company's Motion for Summary Judgment (Doc. 24) and Plaintiffs' Motion for Summary Judgment (Doc. 30). This lawsuit arises from a commercial general liability insurance policy and umbrella policy that defendant Arrowood issued to plaintiffs. Plaintiffs seek a declaration that Arrowood had a duty to defend and indemnify them with regard to claims brought in a class action lawsuit originally filed against plaintiffs in 2003. The Court has diversity jurisdiction over this lawsuit. For the reasons that follow, Arrowood's Motion for Summary Judgment (Doc. 24) is GRANTED, and Plaintiffs' Motion for Summary Judgment (Doc. 30) is DENIED.

**FACTS**

Plaintiff Lakeside Terrace Ltd. ("Lakeside") is a limited liability partnership that formerly owned a mobile home park, Lakeside Terrace Mobile Home Park ("the Park"), located in Streetsboro, Ohio. Plaintiff Lakeside Terrace Homes Sales, Ltd. ("Lakeside Homes") is a limited liability partnership that sold the homes put into the mobile home park. Plaintiff Richard A. Sommers is a shareholder and director of Lakeside and Lakeside Homes. (Lakeside, Lakeside Homes, and Sommers, collectively, "Lakeside").

**A. The underlying lawsuit**

On August 21, 2003, a resident of the Park, Betty Sefsic, filed a class action complaint ("the Original Complaint") against Lakeside.[1] Sefsic purchased a manufactured home in 2001 for installation in the Park. She alleged in her complaint that, after she took possession of her home, she discovered numerous defects, unauthorized deviations, and unfinished work that breached Lakeside's contract with her. She claimed that Lakeside had constructed and permanently attached the garage to her home against the manufacturer's advice and that the garage roof and floor leaked as a result. She also claimed that her lot experienced recurrent flooding and stagnant water after normal rainfalls, causing health and safety risks, property damage, and loss of enjoyment of her home. In addition, the complaint contained claims regarding misrepresentations that Lakeside had allegedly made in its marketing regarding the value of the Park's manufactured homes and common area amenities that Lakeside promised to build but never did (such as a swimming pool, community center, walking trails, exercise room, and sports courts). Sefsic also complained of deceptive fees that Lakeside had "buried" in the purchase price of her

---

[1] The Original Complaint also named Sommerset Development Ltd. as a defendant.

home.

She brought sixteen counts against Lakeside: breach of contract, unjust enrichment, unfair or deceptive trade practices in violation of Ohio Rev. Code § 1345.02, unconscionable consumer sales practices in violation of Ohio Rev. Code § 1345.03, fraud, statutory violations of Ohio Revised Code Chapter 3733 governing manufactured home parks (unlawful abdication of park operator's obligations, failure to fully disclose fees, failure to offer written one-year rental agreement, requiring owner to purchase manufactured home from park operator, requiring owner to purchase personal property from park operator, requiring owner to purchase services from park operator, failure to prevent recurring flooding, failure to provide or maintain adequate water drainage system, failure to provide required recreational area and facilities, and unlawful retaliation), and punitive damages.

In July of 2005, Phillip and Lorrie Centorbi were substituted as plaintiffs in the action. The Centorbis filed a First Amended Complaint on behalf of all persons who purchased a manufactured home for installation in the Park and qualified as residents of the Park. Like Sefsic, the Centorbis alleged that Lakeside had made misrepresentations in its marketing about the value of the homes and about common area amenities that were promised but never built. They also alleged that Lakeside had hidden fees in the purchase price. The First Amended Complaint, however, did not contain factual allegations or claims related to defective construction, water damage from rain, or flooding. The First Amended Complaint alleged that Lakeside's actions caused "serious and continuing damage to the [the Centorbis'] property and loss of enjoyment of full use of their leased premises." The Centorbis brought claims for statutory violations of Chapter 3733 (unlawful abdication of park operator's obligations, failure to fully disclose fees,

3

and failure to provide required recreational area and facilities), unjust enrichment, and punitive damages.

The Centorbis filed a Second Amended Complaint on December 2, 2005, on behalf of all persons who have resided in the Park at any time since it opened and paid all or part of the "site preparation fee" charged by Lakeside to prepare their manufactured home. The factual allegations in the Second Amended Complaint were substantially similar to the factual allegations in the First Amended Complaint, including the lack of any allegations regarding defective construction or recurrent flooding and stagnant water in and around the Centorbis' lot. Again, the Centorbis alleged that Lakeside's actions caused "serious and continuing damage to their property and loss of enjoyment of full use of their leased premises." They brought claims for violations of Ohio Rev. Code Chapter 3711 (unlawful abdication of park operator's obligations, failure to fully disclose fees, failure to provide required recreational area and facilities), unfair or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02, unconscionable consumer sales practices in violation of Ohio Rev. Code § 1345.03, unjust enrichment, and punitive damages.

### B. Insurance coverage dispute

Lakeside was insured under an Arrowood commercial general liability policy and umbrella policy (collectively, "the policy") during the period when these lawsuits were filed. The policy's provision regarding coverage for bodily injury or property damage states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any

"occurrence" and settle any claim or "suit" that may result.

The policy also contained a provision for "personal and advertising injury," which states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising" injury to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

The policy contains the following definitions:

> "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
>
> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:...c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor....
>
> "Property damage" means:
> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Lakeside tendered the Original Complaint to Arrowood. In a letter dated April 29, 2004, Arrowood denied coverage for all but two counts of the complaint because the denied counts did not seek damages for "bodily injury" or "property damage" caused by an "occurrence." It also disclaimed coverage on the basis of several exclusions in the policy. (Arrowood Mot. Sum. J., Ex. D). It agreed to defend the entire complaint, however, because Sefsic's claims for failure to

5

prevent recurring flooding and failure to provide or maintain adequate water drainage system were potentially covered under the policy. Lakeside and Sefsic ultimately settled her individual claims, with contribution from Arrowood. (Cornwell Dep. at 116).

Thereafter, on October 6, 2005, Arrowood disclaimed any defense or indemnity obligation for the Centorbis' First Amended Complaint because the amended complaint did not seek damages for "bodily injury" or "property damage" caused by an "occurrence" or for a "personal and advertising injury," as defined by the policy. It also noted that several policy exclusions precluded coverage. Because Sefsic had been replaced as plaintiff and settled her individual property damage claims with Lakeside, Arrowood refused to defend any of the claims in the First Amended Complaint.

Lakeside sent a letter to Arrowood on January 10, 2006, disputing the basis of Arrowood's denial and asking Arrowood to consider coverage for the Second Amended Complaint. Arrowood responded in a letter dated March 6, 2006, in which it maintained its position that it had no obligation to defend or indemnify Lakeside for the claims in the Second Amended Complaint because they did not seek damages for "bodily injury" or "property damage" caused by an "occurrence" or for a "personal and advertising injury." The letter also noted that even if the complaint sought such damages, coverage would be precluded under a number of exclusions in the policy. Arrowood ended the letter by asking Lakeside to send any further information that it believed might affect the coverage determination. Receiving no response to its declination letter, Arrowood eventually closed the file on August 23, 2006.[2]

---

[2]  Lakeside eventually settled the class action for $21,007.50 and the Centorbis' claims for $3,600. The cost to defend the First and Second Amended Complaint was $48,389.13.

6

Around this same time, Lakeside was attempting to finalize a financing loan deal with UBS Financial for the Park project. (Pls.' Mot. for Summ. J. at 1; Compl. ¶ 31). According to Lakeside, UBS's counsel requested confirmation from Arrowood that it would provide coverage if Lakeside was found responsible on the class action claims. (Sommers Dep. at 46-47). When Arrowood refused to provide such confirmation, UBS withdrew its financing commitment for the project. (*Id.* at 47). Lakeside asserts that, as a result of UBS withdrawing its loan, PNC Bank, the lender who had financed a three-year construction loan on the property, began foreclosure proceedings, causing Lakeside to suffer damages.

Nearly ten years later, Lakeside filed this lawsuit. Lakeside brings claims for breach of contract and declaratory judgment. It seeks damages in excess of $4,000,000 for defense costs, indemnification, costs of litigation, and consequential damages. Pending before the Court are the parties' cross-motions for summary judgment.

**SUMMARY JUDGMENT STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary

judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard. See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a

jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### **ANALYSIS**

Under Ohio law, an insurer's duty to defend a claim is broader than its duty to indemnify. *Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St. 3d 186, 189 (2006). The action's ultimate outcome or the insurer's ultimate liability does not determine the duty to defend. *Id.* (citing *Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St. 2d 41 (1973)). Rather, an insurance company is obligated to defend an action brought against its insured if the underlying complaint contains at least one claim "that falls either potentially or arguably within the liability insurance coverage." *Cincinnati Ins. Co. v. Anders*, 99 Ohio St. 3d 156, 159 (Ohio 2003). Under Ohio law, once one claim in an underlying complaint is even arguably covered, the insurer must provide a defense as to all claims, even if the other claims clearly do not fall within the policy's coverage. *Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St. 3d 186, 189 (2006). An insurer's obligation to defend continues until the claim is confined to a theory of recovery that the policy does not cover. *Great Am. Ins. Co. v. Hartford Ins. Co.*, 85 Ohio App. 3d 815, 818 (1993). The duty to defend,

therefore, is absolved once there is no possibility of coverage under the policy based on the allegations in the complaint. *Ins. Co. of N. Am. v. Travelers Ins. Co.*, 118 Ohio App. 3d 302, 313–14 (Ohio Ct. App. 1997).

When interpreting an insurance contract, a court must give the provisions and terms in the contract a reasonable construction. *Hillyer v. State Farm Mut. Auto Ins. Co*, 131 Ohio app. 3d 172, 177 (Ohio Ct. App. 1999). If a provision or term in the policy is ambiguous, the policy is to be interpreted in favor of the insured. *Etter v. Travelers Ins. Co.*, 102 Ohio app. 3d 325, 332 (Ohio Ct. App. 1995).

Here, Arrowood provided a defense on the Original Complaint until Lakeside settled Sefsic's individual property damage claims. At this point, Arrowood argues that the underlying lawsuit was confined to claims that the policy does not cover. The issue is, therefore, whether Arrowood had a duty to defend or indemnify Lakeside for the claims in the First and Second Amended Complaints. For the following reasons, the Court finds that it did not.

### A. "Property damage" coverage provision

Lakeside asserts that Arrowood had an obligation to defend and indemnify it for the claims in the First and Second Amended Complaints under the "loss of use" provision of the property damage coverage. Under that provision, Arrowood is obligated to provide coverage for "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." Arrowood maintains that this provision does not apply to the claims in the complaints because they did not seek damages for "property damage" caused by an "occurrence." For the following reasons, the Court agrees that the claims do not potentially or arguably seek damages for an "occurrence" as defined by the

10

policy.

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"; it does not define "accident." The Ohio Supreme Court has construed the term "accident" in a commercial general liability insurance policy with an identical definition of "occurrence" as the policy here to mean "unexpected, as well as unintended." *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St. 3d 476, 481 (2012). "Inherent in the plain meaning of 'accident' is the doctrine of fortuity. Indeed, '[t]he fortuity principle is central to the notion of what constitutes insurance.'" *Id.* (quoting *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 74 (Ky. 2010)). The court stressed that commercial general liability policies "are not intended to insure business risks–risks that are the normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage." *Id.* at 480 (quotations omitted). As a result, such a policy only provides coverage for "claims arising out of tort, breaches of contract, and statutory liabilities as long as the requisite accidental occurrence and property damage are present." *Id.* at 481 (quotations omitted).

Ohio courts and courts applying Ohio law have consistently held that insurance policies do not cover negligent misrepresentation claims that lack an element of fortuity resulting in property damage. For example, in *Cincinnati Ins. Co. v. Anders*, the Ohio Supreme Court held that a claim for negligent misrepresentation related to a failure to disclose faulty construction on a home that was being sold was a claim for economic loss only because it did not involve an accident that resulted in property damage. 99 Ohio St. 3d 156, 160 (2003). *See also Westfield Ins. Cos. v. D.C. Builders, Inc.*, 2004 WL 309272 (Ohio Ct. App. 8th Dist. Feb. 19, 2004)

11

(holding that claim against the insured, a general contractor, for negligently misrepresenting its expertise and cost of project was not covered because it did not involve an accident resulting in property damage but instead was a claim for economic loss only); *Valley Ford Truck, Inc. v. Phoenix Ins. Co.*, 813 F. Supp. 2d 859, 864 (N.D. Ohio 2011) (holding that policy did not cover claim for negligent misrepresentation against insured for negligently telling customer that trucks sold by insured had certain features that the trucks did not have).[3]

The claims in the First and Second Amended Complaints relating to Lakeside's misrepresentations regarding fees, amenities that were to be provided in the Park, and the value of the Park's homes all lack the element of fortuity required to constitute an "accident" within the meaning of the policy's definition of "occurrence." Rather, the claims seek economic loss only and involve the kinds of business risks within Lakeside's control that a commercial general liability insurance policy is not intended to cover.

The cases that Lakeside relies on are not to the contrary. For example, in *IMG Worldwide, Inc. v. Westchester Fire Ins. Co.*, the underlying plaintiffs sued Sunvest and the insured, IMG, alleging that Sunvest had sold them undeveloped properties with the promise that they would be upgraded and developed into high-end condominiums but then abandoned the project. 572 Fed. Appx. 402, 405-06 (6th Cir. 2014). Although IMG was a consultant on the project with no obligation to actually develop or finance the property, the district court denied its motion for summary judgment on the plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). It found that a jury could conclude that IMG contributed to

---

[3] The definitions of "occurrence" in the insurance policies at issue in *Anders*, *Valley Ford*, and *D.C. Builders* were similar to the definition of "occurrence" in the Arrowood policy.

Sunvest's misleading impression that IMG would build a sports center in the development and that IMG was in legal partnership with the developers. IMG ultimately settled the case; it then sued Westchester for indemnification and defense costs. *Id.* at 406. IMG argued that the alleged property damage–a loss of use of the properties–was caused by an "occurrence," namely, a downturn in the economy that led to the developers' abandonment of the project. *Id.* at 407. The Sixth Circuit agreed that a jury could find that the underlying claims involved an occurrence. The court noted that the underlying lawsuit "did not arise out of a straightforward purchase and sale situation where the misrepresentation necessarily caused the damage." *Id.* at 409. Rather, as it explained:

> there were several stages of causation in this case: at the preliminary stage, IMG may have inadvertently ... made or contributed to misrepresentations, but the developers' abandonment of the project is what gave rise to the lawsuit....[T]he confluence of these events–IMG's unintentional "contributions" to or "approval of" the misrepresentations and the developers' abandonment of the project–was the legal basis for IMG's liability. Moreover, the jury could have found that the confluence of these events was "unexpected, unintended, and fortuitous" such that the lawsuit would be covered under the terms of the policy.

*Id.* at 408-09.

Unlike in *IMG*, the misrepresentations at issue in the underlying lawsuit in this case *did* arise out of a straightforward purchase and sale situation. Lakeside has not identified any fortuitous event–such as a downturn in the economy–that, together with Lakeside's misrepresentations, caused property damage to the underlying plaintiffs. Without such a confluence of events, no jury could find that the events giving rise to the claims in the First and Second Amended Complaints were the type of "unexpected, unintended, and fortuitous" events covered by the policy.

*Hartzell Industries, Inc. v. Federal Insurance Co.*, 168 F. Supp. 2d 789 (S.D. Ohio 2001),

13

is also distinguishable. In *Hartzell*, the underlying claim involved the failure of a fan that Hartzell had supplied to the insured for the purpose of cooling the plaintiff's boiler house. As a result of the fan's failure, the boiler house became less useful and the plaintiff suffered a loss of productivity in the house. Federal Insurance tendered a defense and contributed to the settlement of the underlying action. It then filed a lawsuit in federal court seeking to recover all that it had paid other than the amount for the damage to the fan itself. The district court first held that the partial loss of use of the boiler house constituted property damage within the meaning of the policy because the boiler house became less useful when the fans were turned off. This was true even though the loss was economic in nature rather than physical. The court also rejected Federal Insurance's argument that the claims in the underlying lawsuit did not involve an "occurrence." It had no trouble concluding that the "catastrophic failure of Hartzell's fan was an 'accident,' within the ordinary meaning of that term." 168 F. Supp. 2d at 796. Because the snapping of the propellers on the fan was an unexpected or unintended event, it could not "reasonably be viewed as anything other than an 'accident.'" *Id.* at 796-97. As such, the fan's failure qualified as an occurrence under the policy's terms. *Id.*

Here, Lakeside relies on *Hartzell* to argue that the claims in the underlying lawsuit were for "property damage" because the plaintiffs alleged loss of full use and enjoyment of their properties when they were not provided with the Park amenities they were to receive. Even assuming Lakeside is correct that the underlying claims involved property damage, Lakeside's argument ignores the fact that the property damage must be caused by an "occurrence." On that issue, *Hartzell* does not support Lakeside. Lakeside's failure to fulfill its promise to build certain amenities at the Park–something that Lakeside has not shown or even argued was outside its

14

control for unexpected reasons–is simply not analogous to the catastrophic and unexpected failure of the fan in *Hartzell*.

Because the claims in the First and Second Amended Complaints did not allege claims that potentially or arguably sought damages for an "occurrence" as defined by the policy, Arrowood did not have a duty to defend or indemnify Lakeside under the property damage coverage provision in the policy. The Court, therefore, need not address Arrowood's argument that the "owned property" and "impaired property" exclusions preclude coverage.

### B.  "Bodily injury" coverage provision

The First and Second Amended Complaints do not seek damages for "bodily injury," defined by the policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," nor does Lakeside argue that they do. Arrowood thus had no defense or indemnity obligation for the complaints under the policy's coverage provision for  "bodily injury."

### C.  "Personal and Advertising Injury" coverage provision

Finally, Lakeside argues that Arrowood owed a duty to defend and potentially indemnify for the claims in the First and Second Amended Complaints because the complaints contained claims that were covered by the policy's "personal and advertising injury" provision. According to Lakeside, the allegations regarding its misleading advertising about park amenities and cost savings "fall squarely within the definition of personal and advertising injury, as those allegations, if taken as true, directly impacted the Underlying Plaintiffs [*sic*] right of private occupancy, i.e., loss of use." It relies on the following definition of "personal and advertising injury" in the policy as support: "'Personal and advertising injury' means injury...arising out of

15

one or more of the following offenses:...c. The wrongful ... invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." Lakeside's theory is that the right to use the Park amenities that Lakeside promised but never delivered to Park residents "amounts to an implied easement; and the loss of use of these amenities, as alleged by Underlying Plaintiffs, results in an invasion of private occupancy, and thus injury, that triggers coverage under the personal and advertising injury clause" of the policy. (Pls.' Mot. for Summ. J. at 22).

      Lakeside's theory is not a reasonable interpretation of the policy. Even assuming that the underlying plaintiffs would have had an implied easement to use the Park amenities promised by Lakeside, it is undisputed that the amenities were never built–indeed, that was the point of the underlying lawsuit. With no amenities to invade, Lakeside has not shown how the "wrongful ... invasion of the right of private occupancy" provision of the personal injury endorsement was implicated by the allegations in the First and Second Amended Complaints.

      Moreover, in interpreting a similar personal injury endorsement in *Sherwin Williams Co. v. Travelers Cas. & Sur. Co.*, Ohio's Eighth District Court of Appeals held that the tort of "'invasion of the right to private occupancy' requires some purposeful intent by the alleged tortious actor....Th[is] offense[] [is] listed among other enumerated offenses which all require a purposeful act. Therefore, reading...'invasion of the right to private occupancy' within the context of the list, this type of coverage is designed to cover claims arising from the improper physical entry of a person onto property owned or occupied by another...with the intent to dispossess the occupant of its property rights." 2003 WL 22671621 (Ohio Ct. App. 2003) (holding that pollution claim was not covered under the personal injury coverage because the

parties agreed that the insured did not intend to cause property damage). Similarly, the parties here agree that the complaints do not allege that Lakeside acted with intent. (*See* Pls.' Mot. for Summ. J. at 16) ("Plaintiffs' alleged breaches of various statutory duties under the Statute and/or the OCSPA were unintended and/or unexpected happenings."). In addition, the allegations in the First and Second Amended Complaints do not allege that Lakeside physically entered property owned or occupied by the Centorbis or any other residents of the Park with the intent to dispossess the residents of their property.

Lakeside cites only one case on this issue, *Meyers Lake Sportsman's Club, Inc. v. Auto-Owners Mutual Insurance Co.*, 2013 WL 3787437 (Ohio Ct. App. July 15, 2013), which does not support its position. In *Meyers Lake*, an insurance company sought a declaratory judgment that it did not owe a duty to defend or indemnify its insured for trespass and ejectment counterclaims brought against it. In the underlying lawsuit, the insured had brought a claim against Meyers Lake Preserve, alleging that members of the insured's club had an implied easement to use Meyers Lake. Meyers Lake Preserve then filed its counterclaims against the insured for trespass and ejectment. The Fifth District affirmed the trial court's holding that the counterclaims triggered the "personal injury" coverage: "Because the [insured's] club has an implied easement to use Meyer's Lake, and the Preserve likewise has a right of occupancy of Meyers' Lake, the alleged personal injury suffered by the Preserve was in fact an alleged invasion of the Preserve's property right of private occupancy which was committed by the [insured.] Moreover, the asserted loss of use of the premises that allegedly was caused by appellees constitutes property damage." *Id.* at *5.

Unlike the trespass and ejection claims at issue in *Meyers Lake*, nothing in the First and

17

Second Amended Complaints can even arguably be construed as an allegation that Lakeside trespassed or physically invaded the right of private occupancy of the Park residents' property. Rather, the crux of the complaints is that Lakeside failed to provide amenities and perks at the Park on land owned by Lakeside. Arrowood thus had no defense or indemnity obligation for the complaints under the policy's coverage provision for "personal and advertising injury."

**CONCLUSION**

For the foregoing reasons, Arrowood Indemnity Company's Motion for Summary Judgment (Doc. 24) is GRANTED, and Plaintiffs' Motion for Summary Judgment (Doc. 30) is DENIED.

IT IS SO ORDERED.

                 */s/ Patricia A. Gaughan*
                 PATRICIA A. GAUGHAN
                 United States District Judge

Dated: 8/26/16